## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**VENKANNA KANNA, M.D.,**

       **Plaintiff,**

   **v.**

                          **Case No. 2:08-cv-242**
                          **Judge Sargus**
**HON. JAMES B. PEAKE, Secretary,**      **Magistrate Judge Preston Deavers**
**United States Department of Veterans**
**Affairs,**

       **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant Secretary James B. Peake's Motion for Summary Judgment.  (Doc. 38.)  For the reasons set forth below, Secretary Peake's motion is **DENIED**.

## I.

Plaintiff, Dr. Venkanna Kanna ("Dr. Kanna"), brings the instant action against the Secretary of the United States Department of Veterans Affairs ("Secretary")[1] alleging that he was terminated from his position at a Veterans Affairs medical center in Chillicothe, Ohio, on the basis of his race and national origin, in violation of Title VII of the Civil Rights Act of 1964.

Dr. Kanna was born in India and is of Indian descent.  (Kanna Aff. ¶ 2, Mar. 29, 2010.) He graduated from medical school in India, emigrated to the United States in 1979, and became a United States citizen in 1986.  (Kanna Aff. ¶¶ 3-5, Mar. 29, 2010.)  He served in the United

---

[1] The Court notes that James B. Peake is no longer the Secretary of Veterans Affairs.  The current Secretary is the Honorable Eric K. Shinseki.

States Army between 1986 and 1994, and was first employed by the Veterans Administration

(the precursor to the cabinet-level Department of Veterans Affairs) in 1984.  (Kanna Aff. ¶¶ 6-7,

Mar. 29, 2010.)  Dr. Kanna was employed at the Veterans Affairs medical center in Chillicothe

("VA-Chillicothe" or "hospital") from December 1989 until his termination became effective on

June 2, 2006.  (Kanna Aff. ¶ 8, Mar. 29, 2010.)  At VA-Chillicothe, Dr. Kanna served as a

physician in the medical service or "med/surg" care line and at the time of his termination was

supervised by med/surg chief Dr. Saeree Jane-Wit.  (*See* Jane-Wit Dep. 12.)  At the time of Dr.

Kanna's termination, Douglas Moorman served as director of VA-Chillicothe and Dr. Murali

Chitluri served as medical chief of staff.  (Moorman Dep. 39.)

## A.

The three incidents that resulted in Dr. Kanna's termination occurred over the course of a

few days in late January and early February 2006.  The first incident occurred on January 30th,

when a patient complaining of chest pain had been admitted to the hospital under Dr. Kanna's

care.  (Gray Decl. Attach. 2 at 7.)  When the patient was discharged, Dr. Kanna allegedly failed

to enter a discharge summary into the patient's medical records in violation of VA-Chillicothe

policies, and failed to recommend follow-up clinical investigations such as stress testing or

clinical catheterization as suggested by the local provider responsible for transferring the patient

to VA-Chillicothe.  (Gray Decl. Attach. 2 at 7.)

The second incident occurred on February 1st, when Dr. Kanna was assigned to serve as

the hospital's Medical Officer of the Day or "MOD."  (Gray Decl. Attach. 2 at 3.)  Physicians at

VA-Chillicothe serve as the MOD on a rotating basis.  (Jane-Wit Dep. 89.)  When staff

physicians serve as the MOD, it is their duty to cover the entire hospital from the end of normal

business hours at 4:30 p.m. until they are relieved at 7 p.m. by a contract physician working the

night shift.  (Jane-Wit Dep. 89-91.)  Pursuant to a VA-Chillicothe policy in place during the

events in question, the staff MOD was required to treat all patients who arrived in the admission

area before 6:30 p.m. even if doing so meant staying beyond 7 p.m.  (Gray Decl. Attach. 2 at 4.)

On February 1st, Dr. Kanna allegedly left the hospital without treating four patients who

had arrived before 6:30.  On that day, he allegedly was paged between 4:30 and approximately

4:50 by a staff nurse working in the admissions area to inform him of a patient waiting to be

seen.  (Gray Decl. Attach. 2 at 4.)  He did not arrive to treat the patient until 5:50, and upon

treating the patient, was informed that four other patients were also waiting.  (Gray Decl. Attach.

2 at 4.)  At this point, instead of treating the four patients, Dr. Kanna left to eat.  (Gray Decl.

Attach. 2 at 4.)  While he was eating, the nursing supervisor reminded him that patients were

waiting to be seen.  (Gray Decl. Attach. 2 at 4.)  Dr. Kanna did not arrive back to the admissions

area until just before 7 p.m., at which point he informed the staff that he would not see any more

patients.  (Gray Decl. Attach. 2 at 4.)  He then left the hospital, despite being reminded by a

nurse that the policy required him to see the four patients who had arrived before 6:30.  (Gray

Decl. Attach. 2 at 4.)

The third incident also occurred on February 1st, concurrently with the second incident.

At approximately 4:50 p.m., Dr. Kanna received a call from the laboratory reporting that a

patient had a potassium level of 7.2, which is considered critical.  (Gray Decl. Attach. 2 at 6.)

Elevated potassium levels can lead to cardiac arrest, and levels above seven are considered

extremely high.  (Hasan Dep. 34-35.)  Instead of taking action to treat the patient, Dr. Kanna

initially called nurse Donna Henry, and instructed her to inform the relieving MOD, Dr. Rivera,

of the situation when Dr. Rivera came on duty.  (Gray Decl. Attach. 2 at 6.)  Shortly thereafter, Dr. Kanna called again and had the patient transferred to the intensive care unit.  (Gray Decl. Attach. 2 at 6.)  The patient's condition was subsequently treated and managed by Dr. Rivera, who relieved Dr. Kanna.  (Gray Decl. Attach. 2 at 6.)

Dr. Kanna disputes some of the details of the above incidents.  He contends that he was concerned about treatment options for the patient with the high potassium level because the patient was diabetic, and claims that he ordered an EKG in the intensive care unit so that he could determine if the elevated potassium was causing any cardiac arrhythmia.  (Kanna Aff. ¶¶ 10-11, Mar. 29, 2010.)  He also claims that he informed Dr. Rivera about the situation and, in any event, knew that Dr. Rivera would promptly attend to patients in the intensive care unit. (Kanna Aff. ¶¶ 12-13, Mar. 29, 2010.)  With regard to the four patients he allegedly left waiting to be treated, Dr. Kanna asserts that he was not informed about the patients until a few minutes before his shift was scheduled to end and that, at that time, Dr. Rivera was already seeing patients.  (Kanna Aff. ¶ 14, Mar. 29, 2010.)  None of the patients involved in the above incidents suffered adverse medical consequences as a result of Dr. Kanna's alleged conduct.  (*See* Gray Decl. Attach. 2 at 5, 7.)

**B.**

VA-Chillicothe's policy on patient abuse defines patient abuse to include "intentional omission of patient care."  (Gray Decl. Attach. 1 at 1.)  This policy specifies that if patient abuse is suspected, an investigation is to be conducted in accordance with Veterans Affairs' policies. (Gray Decl. Attach. 1 at 2.)  According to then-VA-Chillicothe Director Douglas Moorman, a preliminary review of the allegations indicated suspected patient abuse because the facts showed

that Dr. Kanna had intentionally left patients waiting in the admissions area when it was his responsibility to treat them.  (*See* Moorman Dep. 87-89.)  Accordingly, Moorman decided to convene what is known as an Administrative Investigation Board ("AIB"), which is an investigatory panel with the power to take sworn testimony, to investigate the suspected patient abuse by Dr. Kanna.  (Moorman Dep. 88-89.)  Dianna Gray, the Quality Manager at VA-Chillicothe, coordinated the selection of the three member AIB and the proposed members were approved by Moorman.  (Gray Decl. ¶¶ 4, 13.)  The three members of the panel included Chairperson Dr. Farhana Hasan, a physician from a Veterans Affairs Medical Center in Columbus, Ohio; Mark Sentieri, administrative assistant to chief of staff Dr. Chitluri; and Donna Wamsley, a nurse at VA-Chillicothe.  (Gray Decl. ¶¶ 11-12.)

On March 23, 2006, the AIB issued its report covering the three incidents mentioned above and two other allegations that apparently are not relevant to this lawsuit.  (Gray Decl. Attach. 2 at 1.)  With regard to the patient suffering from chest pain, the AIB concluded that Dr. Kanna violated hospital policy by not entering a discharge summary and provided substandard care in failing to recommend follow-up testing for the patient.  (Gray Decl. Attach. 2 at 7.)  Concurring with the charge that he left the hospital without treating the four patients, the AIB concluded that Dr. Kanna failed to meet the obligations of the MOD and refused to see patients he should have seen before ending his shift.  (Gray Decl. Attach. 2 at 5.)  The AIB further concluded that in refusing to see the patients, Dr. Kanna created a hardship for the incoming MOD and negatively affected the perception of the quality of care offered at VA-Chillicothe.  (Gray Decl. Attach. 2 at 6.)  Finally, as to the patient with the elevated potassium level, the AIB concluded that Dr. Kanna failed to manage the potentially life-threatening situation despite being

5

aware of the danger, and that failure reflected patient abuse, patient neglect, and substandard care.  (Gray Decl. Attach. 2 at 7.)

After the AIB issued its report, Gray issued a memorandum to Moorman summarizing the findings of the AIB, and making the following recommendation: "The findings and conclusions in Allegations 2, 3, and 4 [(the incidents in question)], support the allegations of substandard care, neglect and patient abuse; therefore, it is recommended that appropriate administrative action be taken."  (Gray Decl. ¶ 16; Attach. 3 at 2.)  As Director of VA-Chillicothe, Douglas Moorman had the sole authority to decide how Dr. Kanna should be punished for his actions.  (*See* Moorman Dep. 64-65; Jane-Wit Dep. 44.)  In so deciding, he was to consult the Veterans Affairs' "table of penalties," which provide a range of penalties for given misconduct, and also consider what are known as "Douglas Factors," which are aggravating and mitigating circumstances including things such as the egregiousness of the offense, potential for rehabilitation, and length of service.  (*See* Moorman Dep. 35.)

On April 24, 2006, Dr. Jane-Wit issued a memorandum to Dr. Kanna notifying him that the proposed penalty for his conduct was termination from employment.  (*See* Moorman Dep. Ex. 26.)  At his deposition, Dr. Jane-Wit testified that he issued this memorandum at the behest of the human resources department and Dr. Chitluri, who were acting under instruction from Moorman.  (*See* Jane-Wit Dep. 60-64.)  For the incident involving the patient with chest pains, Dr. Kanna was charged with patient abuse by intentional omission of care and disrespectful conduct towards a patient.  (Moorman Dep. Ex. 26 at 4.)  For the incident involving the four patients, he was charged with patient abuse, disrespectful conduct toward patients, failure to provide efficient service when dealing with the public, and disrespectful conduct towards a co-

worker.  (Moorman Dep. Ex. 26 at 2.)  Finally, for the patient with the elevated potassium level,

Dr. Kanna was charged with patient abuse, disrespectful conduct towards a patient, and

disrespectful conduct towards co-workers.  (Moorman Dep. Ex. 26 at 3.)  The table of penalties

specified a range of penalties for a first instance of patient abuse of reprimand through discharge,

for a second, a ten day suspension through discharge, and, for a third, discharge.  (Def.'s Mot.

Summ. J. Attach. 8 at 32.)  The specified range of penalties for disrespectful conduct were the

same as for patient abuse.  (*See* Def.'s Mot. Summ. J. Attach. 8 at 33.) [2]

Dr. Kanna responded to the proposed termination in writing, asserting that the charges

against him should not be sustained because the AIB had failed to consider his written responses.

(*See* Pl.'s Mem. Opp'n Ex. A at 4-5.)  Dr. Kanna's response generally contested the factual

sufficiency of the case against him and the findings of the AIB.  (*See* Pl.'s Mem. Opp'n Ex. A at

4-10.)  Despite Dr. Kanna's response, by memorandum to him dated May 26, 2006, Douglas

Moorman informed him that the charges had been sustained and that he would be terminated

from employment effective June 2nd.  (*See* Moorman Dep. Ex. 27.)  In this memorandum,

Moorman stated that:

> [i]n reaching this decision, I have carefully considered all of the evidence
> developed as well as the written response submitted by you and your
> representative on May 8, 2006.  I have also considered other factors including
> your years of service, your past work record, the seriousness of the offenses with
> which you are charged, and whether there were any mitigating or extenuating
> circumstances which would justify mitigation of the proposed penalty.  I have
> concluded that the sustained charges against you are of such gravity that
> mitigation of the proposed penalty is not warranted, and that the penalty of
> removal is appropriate and within the range of reasonableness.

---

[2]In reviewing the table of penalties, the Court is unable to identify specified penalty
levels for failure to provide efficient service when dealing with the public.

(Moorman Dep. Ex. 27 at 3-4.)  In an attachment to the memorandum, Moorman discussed the application of the Douglas factors to Dr. Kanna.  In this document, Moorman emphasized the egregiousness and intentional nature of the charges sustained against Dr. Kanna, notwithstanding the fact that Dr. Kanna had worked at VA-Chillicothe for sixteen years and that his most recent performance evaluations rated him as highly satisfactory.  (*See* Moorman Dep. Ex. 27 at 5-6.) Moorman also noted that, in the previous six months, Dr. Kanna had been counseled twice for incidents related to interactions with patients, and expressed Moorman's belief that attempted rehabilitation of Dr. Kanna would not likely be successful.  (*See* Moorman Dep. Ex. 27 at 6-7.)

## C.

Dr. Kanna appealed his termination through an administrative process known as a Disciplinary Appeals Board ("DAB").  (*See* Spetnagel Decl. ¶¶ 2-7.)  The members of the DAB were appointed by the Under Secretary for Health and included Chairperson Dr. Warren Blackburn, Jr., Associate Chief of Staff at the VA Medical Center in Birmingham, Alabama; Dr. Arthur Robins, Assistant Chief of Staff at the VA Boston Health Care System; and Dr. Michael Mahler, Chief of Organization and Performance Improvement at the VA Greater Los Angeles Health Care System.  (Spetnagel Decl. ¶ 11.)  The DAB convened on October 3, 2006, and, upon receiving evidence and hearing testimony, sustained all the charges against Dr. Kanna and upheld his removal from employment at VA-Chillicothe.  (*See* Def.'s Mot. Summ. J. Attach. 8 at 19-29.)  In addressing an apparent lack of "progressive discipline," an issue raised by Dr. Kanna, the DAB concluded that "[w]ith three sustained charges of patient abuse in a very short time frame, the discharge penalty without previous discipline is appropriate."  (*See* Def.'s Mot. Summ. J. Attach. 8 at 28.)  The decision of the DAB was subsequently approved and executed

by the acting Principal Deputy Under Secretary for Health.  (*See* Def.'s Mot. Summ. J. Attach. 8 at 19.)

**D.**

Dr. Kanna's allegations of racial and national origin discrimination center on Douglas Moorman.  According to Dr. Kanna, statements made my Moorman during his DAB testimony and other evidence indicate that Moorman improperly took Dr. Kanna's race and national origin into account when deciding to terminate Dr. Kanna's employment.

In his testimony before the DAB, Moorman indicated his belief that, at a hospital where three-fourths of the doctors were of Asian (primarily Indian) descent, doctors who were from Asia were putting "ethnicity" ahead of the business of the hospital.  (*See* Moorman Dep. 23.) When asked to elaborate during his deposition, Moorman, who is African-American, stated that he believed that Asian doctors were possibly showing favoritism toward each other because of their national origin.  (*See* Moorman Dep. 24.)  During his deposition, when asked specifically about Dr. Kanna, Moorman indicated his belief that Dr. Jane-Wit had given Dr. Kanna better performance reviews than Dr. Kanna deserved because of this favoritism.  (Moorman Dep. 154.) Dr. Jane-Wit is apparently from Thailand.  (*See* Sampath Dep. 22.)

Moorman further testified that at VA-Chillicothe, patients frequently complained that they were not able to understand instructions from foreign-born doctors.  (Moorman Dep. 74.) When asked about Dr. Kanna's diction, Moorman indicated that it "merits some attention." (Moorman Dep. 74-75.)  Moorman also stated that some patients even specifically requested American-trained physicians.  (Moorman Dep. 76.)  Moorman told an EEO counselor (during an investigation into Dr. Kanna's eventual EEO complaint) that he would like to have seen "a

9

balance of physician ratios from other ethnic groups [beside Asians] hired at the [hospital]."

(Moorman Dep. 77-78.)  When asked during his deposition what he meant by this, Moorman

answered, "I would like to have had more diversity.  I would like the medical staff to represent

the patients that they provide care to or to be representative of the staff that they provide care

to."  (Moorman Dep. 78.)  According to Moorman, the patients served by VA-Chillicothe are

predominantly Caucasian, with the next group in terms of size being African-American.

(Moorman Dep. 78-79.)  Moorman had also testified before the DAB that he had indicated to

town hall meetings at VA-Chillicothe that he felt there was a need for "new blood" at the

hospital.  (Moorman Dep. 72-73.)  Moorman stated that this was meant "in terms of additional

physicians, in terms of more diversity" and indicated that "the whole context [of those

statements] had to do with this patient satisfaction again."  (Moorman Dep. 73.)[3]

According to former Chief of Staff at VA-Chillicothe, Dr. Murali Chitluri, he, Dr.

Jane-Wit, and the other care-line chiefs all felt as though Dr. Kanna should be suspended without

pay for his conduct instead of being terminated.  (*See* Chitluri Dep. 58-62.)  Dr. Chitluri

expressed those views to Moorman, who ignored them.  (*See* Chitluri Dep. 58-62.)  Dr. Thomas

Oomen, the primary care line manager, remembers Moorman asking him to read a file dealing

with the allegations against Dr. Kanna, and advising Moorman that there was not a strong case

---

[3]Aside from the above statements, there is also evidence in the record that Moorman may have harbored personal animosity toward Dr. Kanna because of Dr. Kanna's public criticism of hospital policies favored by Moorman.  For instance, the former Chief of Staff at VA-Chillicothe, Dr. Murali Chitluri, testified at his deposition that Moorman had expressed to him displeasure with Dr. Kanna after Dr. Kanna had written letters to government officials critical of the policies.  (Chitluri Dep. 34.)  Dr. Chitluri also indicated that Moorman may have referred to Dr. Kanna as a "son of a bitch" and had said, "I'll get him."  (Chitluri Dep. 36, 58.) The Court notes, however, that this purported animosity is facially unrelated to Dr. Kanna's race or national origin.

for firing Dr. Kanna.  (*See* Oomen Dep. 74-79.)

  In October 2006, Dr. Kanna filed an administrative complaint of discrimination with the Department of Veterans Affairs.  (Compl. ¶ 42.)  On December 19, 2007, the Department's Office of Employment Discrimination Complaint Adjudication issued a final decision denying his charge of discrimination.  (Compl. ¶ 46.)  Dr. Kanna subsequently filed the instant action, claiming that race and national origin played an impermissible role in his termination, and the Secretary now moves for summary judgment.

## II.

  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

  In evaluating a motion for summary judgment, the evidence must be viewed in the light

most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59

(1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)(stating that the

court must draw all reasonable inferences in favor of the nonmoving party and must refrain from

making credibility determinations or weighing evidence).  In responding to a motion for

summary judgment, however, the nonmoving party "may not rely merely on allegations or

denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in

this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see*

*Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).

Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's

position will not be sufficient; there must be evidence on which the jury reasonably could find

for the nonmoving party.  *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476,

479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere

allegations, conjecture, or implausible inferences to be insufficient to survive summary

judgment).

## III.

Title VII of the Civil Rights Act of 1964 provides that it is "an unlawful employment

practice for an employer . . . to discharge any individual . . . because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006).  Title VII also

establishes a so-called "mix motive" discrimination claim by providing that "an unlawful

employment practice is established when the complaining party demonstrates that race, color,

religion, sex, or national origin was a motivating factor for any employment practice, even

though other factors also motivated the practice." *Id.* § 2000e-2(m).  However, in cases of

mixed-motive discrimination, if an employer can demonstrate that it would have taken the

employment action at issue even absent its consideration of impermissible factors, the remedies

available to a plaintiff are limited by statute.  *See id.* § 2000e-5(g)(2)(B).

The prohibitions of Title VII are expressly made applicable to executive agencies of the

federal government by 42 U.S.C. § 2000e-16.  Here, Dr. Kanna contends that the decision by

Moorman to discharge him as opposed to taking a lesser disciplinary action was based on his

race and national origin.

## A.

A plaintiff may establish "single motive" Title VII violations by introducing direct

evidence of discrimination or by using inferential and circumstantial evidence that would support

an inference of discrimination.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  "When

using circumstantial evidence to create an inference of discrimination, the complainant must

carry the initial burden of establishing by a preponderance of the evidence a prima facie case of

discrimination by his or her employer."  *Id.*  If a plaintiff can successfully establish a prima facie

case, a fact finder is then to proceed with the familiar burden-shifting analysis announced by the

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this

analysis, if a plaintiff establishes his or her prima facie case, the plaintiff "receives the benefit of

a presumption that the employer unlawfully discriminated against him."  *DiCarlo*, 358 F.3d at

414 (citing *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  The burden

then shifts to the defendant-employer "to articulate some legitimate, nondiscriminatory reason"

for the employment action in question.  *McDonnell Douglas*, 411 U.S. at 802.  Finally, "should

the defendant carry this burden, the plaintiff must then have an opportunity to prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.  The ultimate burden of establishing that discrimination occurred remains with the plaintiff throughout the analysis. *Id.*

A plaintiff may establish a prima facie case of discrimination by proving the following four elements:

> (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class *or* was treated differently than similarly-situated, non-protected employees.

*DiCarlo*, 358 F.3d at 415 (emphasis supplied).  A plaintiff may establish that a defendant-employer's proffered legitimate reason for taking the employment action is a pretext for discrimination by establishing that the proffered reason "has no basis in fact," "did not actually motivate [the plaintiff's] termination," or "was insufficient to warrant [the plaintiff's] termination." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007).

## B.

The analysis of mixed-motive theories of discrimination at the summary judgment stage proceeds somewhat differently than that for single motive cases.  For mixed-motive cases, the Sixth Circuit has rejected the application of the *McDonnell Douglas* burden shifting analysis. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008).  Rather, when deciding whether a potential mixed-motive claim should survive summary judgment, the Court must determine whether the plaintiff has produced sufficient evidence "to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action."

14

*Id.* (internal quotation marks omitted).  The "burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim."  *Id.*

**IV.**

In construing the evidence in a light most favorable to Dr. Kanna, as the Court must do for purposes of deciding a motion for summary judgment, the Court finds that Dr. Kanna has presented sufficient evidence for a reasonable jury to conclude that Moorman decided to terminate him because of his national origin or that Moorman impermissibly considered Dr. Kanna's national origin when deciding his punishment.

Turning first to Dr. Kanna's prima facie case, the parties do not dispute that Dr. Kanna has met the first three factors in that he is Indian, and is thus a member of protected class in terms of his race and national origin, he suffered an adverse employment action in that he was terminated from his position as a physician at VA-Chillicothe, and he was qualified for that position.  The Secretary contends, however, that Dr. Kanna cannot meet the fourth element because he has not produced evidence from which a reasonable jury could conclude that he was replaced by someone outside his protected class or that he was treated differently than similarly situated employees outside his protected class.  In response, Dr. Kanna asserts that he was in fact replaced by an individual of a different national origin.  Dr. Kanna also points to several cases indicating that the *McDonnell Douglas* burden shifting analysis is not the sole means by which a plaintiff can establish a prima facie case of discrimination.  *See, e.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977)("The company and union seize upon the McDonnell

15

Douglas pattern as the only means of establishing a prima facie case of individual discrimination. Our decision in that case, however, did not purport to create an inflexible formulation.").

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Here, there is a dispute in the record as to whether a doctor from China or India was hired to replace Dr. Kanna. For instance, Dr. Jane-Wit has submitted an affidavit in which he avers that Dr. Lakkanna Padmaraju, who is from India, was selected to replace Dr. Kanna in December 2006. (Jane-Wit Decl. ¶¶ 8-10.) According to Dr. Jane-Wit, Dr. Padmaraju's hiring was recommended by VA-Chillicothe's Professional Standards Board and approved by Moorman. (Jane-Wit Decl. ¶¶ 8-10.) However, in his deposition, Moorman testified that a pulmonologist of Chinese national origin had been hired to work in the med/surg care line at some point late in 2006, but before Dr. Padmaraju had been hired. (*See* Moorman Dep. 170-72.) According to Moorman, even though this doctor was a specialist in pulmonology, he still would have been expected to perform the same types of duties in the med/surg line as Dr. Kanna had performed. (*See* Moorman Dep. 171-73.)

Dr. Jane-Wit's affidavit contradicts Moorman's recollection that a pulmonologist of Chinese national origin was hired into the med/surg line after Dr. Kanna was terminated but before Dr. Padmaraju was hired. Further, there is some dispute as to whether the pulmonologist was actually hired to replace Dr. Kanna or if his duties simply overlapped with those Dr. Kanna had performed. However, in deciding a motion for summary judgment, the Court must refrain from weighing evidence and making credibility determinations. Accordingly, in viewing

16

Moorman's testimony in a light most favorable to Dr. Kanna, the Court finds that a reasonable

jury could conclude that Dr. Kanna was replaced by a doctor of different national origin than he.

In other words, if Moorman's testimony is accepted as true, Dr. Kanna was replaced in the

med/surg line by a doctor of Chinese birth, and China and India are obviously different nations

of origin. *See, e.g., Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973)("The term 'national

origin' on its face refers to the *country* where a person was born, or, more broadly, the *country*

from which his or her ancestors came."(emphasis supplied)).  Thus, a jury could conclude that

Dr. Kanna has established a prima facie case of discrimination.

Even if Dr. Padmaraju was hired to replace Dr. Kanna, the Court would not be inclined to

grant summary judgment to the Secretary for Dr. Kanna's failure to make out the standard prima

facie case of discrimination established by *McDonnell Douglas*.  The Sixth Circuit "has declined

to apply the *McDonnell Douglas/Burdine* standards mechanistically."  *Burton v. State of Ohio,

Adult Parole Auth.*, 798 F.2d 164, 166 (6th Cir. 1986).  As noted by the Fifth Circuit in *Jones v.

W. Geophysical Co. of Am.*, 669 F.2d 280 (5th Cir. 1982), the purpose behind the fourth element

in the *McDonnell Douglas* prima facie case analysis is to establish an inference of impermissible

discrimination.  *Id.* at 284.  In the present case, the circumstances surrounding Dr. Padmaraju's

hiring and the strong evidence of a discriminatory motive elicited from Moorman can be viewed

as supporting an inference that Dr. Kanna was terminated because of his national origin.

As pointed out by Dr. Kanna, Dr. Padmaraju was not hired into the med/surg care line

until well after Dr. Kanna had filed his EEO complaint in October 2006.  In such an instance, at

least one circuit has recognized that the hiring of a member of the same protected class as the

plaintiff should not preclude the establishment of a prima facie case of discrimination.  *See*

*Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1535 (11th Cir. 1984)("that Roadway Express hired another black person only after Howard had filed a charge with the EEOC suggests that the hiring might have been motivated by the filing").  As explained below, from Moorman's testimony and other evidence, a reasonable jury could conclude that Dr. Kanna's national origin played a role in his decision to terminate Dr. Kanna as opposed to taking a lesser disciplinary action.  Padmaraju's hiring could be reasonably interpreted in various ways.  For instance, if Padmaraju was hired by Moorman to replace Dr. Kanna, it might be reasonable to infer that Moorman did not harbor animosity to those of Indian descent as evidenced by his willingness to hire someone of such descent.  On the other hand, it would be just as reasonable to view Padmaraju's hiring as having nothing to do with Moorman's feelings about Indians one way or the other.  In this regard, the record is sparse on the details surrounding Padmaraju's hiring. Accordingly, it may very well have been the case that he was the only one who applied for the job, that he was the only or the best qualified candidate, or that Moorman decided to hire him because of Dr. Kanna's EEO complaint.

The Secretary next asserts that he has articulated legitimate, nondiscriminatory reasons for terminating Dr. Kanna and that Dr. Kanna has not produced evidence from which a reasonable jury could conclude that these reasons are merely a pretext for unlawful discrimination.  While the Secretary has produced ample evidence that Moorman decided to terminate Dr. Kanna for legitimate reasons—serious violations of VA-Chillicothe policy that may have endangered patients—Dr. Kanna has also produced sufficient evidence from which a jury could infer that Moorman's stated reasons masked a discriminatory motive.

Dr. Kanna asserts that the record creates a dispute of material fact as to whether

Moorman's stated reasons "did not actually motivate [Dr. Kanna's] termination," the second

means available to a plaintiff to establish pretext. *Abdulnour v. Campbell Soup Supply Co.*, 502

F.3d 496, 502 (6th Cir. 2007). According to the Sixth Circuit,

> [t]he second showing, however, is of an entirely different ilk. There, the plaintiff
> admits the factual basis underlying the employer's proffered explanation and
> further admits that such conduct could motivate dismissal. The plaintiff's attack
> on the credibility of the proffered explanation is, instead, an indirect one. In such
> cases, the plaintiff attempts to indict the credibility of his employer's explanation
> by showing circumstances which tend to prove that an illegal motivation was
> more likely than that offered by the defendant. In other words, the plaintiff argues
> that the sheer weight of the circumstantial evidence of discrimination makes it
> "more likely than not" that the employer's explanation is a pretext, or coverup.

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *abrogation on*

*other grounds recognized by Geiger v. Tower Automotive*, 579 F.3d 614, 621 (6th Cir. 2009).

Here, the AIB found that the evidence supported the allegations against Dr. Kanna, but

the decision of what Dr. Kanna's punishment would be belonged to Moorman. (*See* Moorman

Dep. 64-65.) There is evidence in the record that Chief of Staff Murali Chitluri and Dr. Thomas

Oomen, the primary care line manager, advised Moorman that Dr. Kanna's conduct did not

warrant termination. For instance, Dr. Chitluri testified during his deposition that he and the

care-line chiefs all felt as though Dr. Kanna should be suspended without pay for his conduct

instead of being terminated, and that he expressed those views to Moorman, who ignored them.

(*See* Chitluri Dep. 58-62.) Dr. Oomen testified that he reviewed Dr. Kanna's file at Moorman's

behest, and advised Moorman that there was not a strong case for firing Dr. Kanna. (*See* Oomen

Dep. 74-79.)

In addition to this evidence that high level physicians at VA-Chillicothe believed that

termination would be a harsh penalty, the undisputed record includes Moorman's own

statements about national origin and ethnicity.  Moorman testified before the DAB and during his own deposition that he believed that doctors from Asia showed favoritism toward each other because of their ethnicity.  He also emphasized during his deposition that the patients at VA-Chillicothe, who are mostly Caucasian, frequently complained about not being able to understand the foreign-born doctors.  Some patients even went so far as to request American-trained physicians.  In addition, Moorman told an EEO investigator and reiterated during his deposition that he would have liked to have seen the ethnic composition of the medical staff at the hospital better reflect the ethnic composition of the patients.  In his view, the fact that most of the doctors at VA-Chillicothe were foreign born was an issue.  He openly discussed a need for "new blood," by which he meant more diversity.  A reasonable jury could conclude that Moorman wanted fewer doctors of Indian origin on the staff at the hospital.[4]

From these statements, a reasonable jury could conclude that it was more likely than not that Dr. Kanna's national origin was the real reason why Moorman decided to terminate as oppose to suspend Dr. Kanna.  For instance, a jury could conclude that Dr. Kanna's misconduct gave Moorman the opportunity to replace an Indian doctor with an American-born physician.

---

[4]Additionally, the record contains evidence that Moorman did not believe that Dr. Kanna could communicate clearly with patients and evidence that Moorman was upset with Dr. Kanna because of Dr. Kanna's public opposition to policies favored by Moorman.  While the evidence of these issues is not facially related to national origin, it could be interpreted as reflective of Moorman's alleged bias against foreign-born doctors.  For instance, Moorman stated that patients complained about not being able to understand instructions from their physicians and that Dr. Kanna's diction "merits some attention."  (See Moorman Dep. 74-75.)  While it is evident that doctors must be able to clearly communicate with their patients, these statements may also be probative of national origin animus as immigrants often speak with an accent.  Similarly, Moorman's anger at Dr. Kanna for writing letters to government officials is not necessarily related to Dr. Kanna's national origin.  However, when viewed with Moorman's statements regarding Indian doctors, the Court notes, without deciding, that the issue of Moorman's anger at Dr. Kanna's criticism could be in part a sequelae of national origin bias.

Finally, based upon the same evidence described above, Dr. Kanna has also proffered sufficient evidence for his claim to be decided by a jury on a mixed-motive theory.  For a mixed-motive claim to survive summary judgment, the plaintiff must produce sufficient evidence "to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)(internal quotation marks omitted).  Here, Dr. Kanna suffered an adverse employment action when he was terminated from his position as a physician at VA-Chillicothe.  Further, Moorman's statements regarding ethnicity and national origin could lead a reasonable jury to conclude that Dr. Kanna's national origin was considered by Moorman when he decided to fire Dr. Kanna.

## V.

For the reasons set forth above, Secretary Peake's Motion for Summary Judgment (Doc. 38) is **DENIED**.

**IT IS SO ORDERED.**


**June 23, 2010**                                    */s/Edmund A. Sargus, Jr.*
**DATED**                                            **EDMUND A. SARGUS, JR.**
                                                     **UNITED STATES DISTRICT JUDGE**